Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated, please. All right, first case we're going to hear this morning is Glover v. EQT Corporation, and Mr. Lynn will hear from you when you're ready. Good morning, it may please the Court. Albert Lynn on behalf of Appellants. I have with me Jennifer Hicks from the Bapst Calland Firm. Each aspect of the class certification that's at issue here should be reversed. First, the certification of the fraud claims is premised on the District Court's mistaken conclusion that West Virginia law does not require a showing of reliance for fraudulent inducement claims. Second, the certification of the contract claims is wrong primarily because the District Court erred in deciding that the widely varying language in at least 70 different oil and gas lease forms has no bearing on whether each of those leases all require a separate royalty for natural gas liquids, and if so, what various factors go into calculating that royalty. So, if I may, I'll turn to the fraud claims. Yes, Your Honor. Procedurally, just asking about whether the... I didn't think we had the fraud claims before us. The reason I say this is that the fraud claims were dismissed by the District Court, and the representative parties don't have any claims, and there's nothing here. While there was a certification that included that, at this point, it seemed to me until there are people that have representative claims and can step forward and represent the fraud claims. I think the courts intended to throw that out, didn't they? Your Honor, I think it's a little bit unclear. If you look at the order, it only talks about the representative, the individual claims, and the Supreme Court has said, and I think this Court has recognized that after a class is certified, it has status as an independent legal entity. So, it's not clear to us. I don't think under the case law that the fraud class is gone. I think if it goes back, and if this Court affirms the certification that it goes back, then... How do we assess it now, at this point, without any representative party? I mean, the Supreme Court has suggested the possibility that some representative party could step forward or be replacing the ones that were dismissed. But at this point, the analysis that you need to conduct under 23 can't be conducted because we don't have any parties at this point. This is an interlocutory appeal, 23-F appeal, and all right. I don't know how you want to handle it, but I'm speaking just for myself now, not the panel, but I didn't think we had the fraud before us. I understand, Your Honor. I think it's still here because the district court didn't change the certification of the fraud. Has the summary judgment on the fraud claim been appealed? It hasn't been, Your Honor. And so the summary judgment on the fraud claims could still be. . . Well, it's a partial judgment, and so I don't think there was a 50. . . Interlocutory at this point. In other words, the case is ongoing. This is an interlocutory appeal. Correct, Your Honor, but I was just. . . It could be appealed at final judgment. It could. I was just thinking through the partial final judgment issue. There was no partial 54B, which is why. . . So the summary judgment claim could. . . It could be appealed. Could be appealed later. And so, I mean, again, I think if the district court had intended to vacate the certification of the fraud order, he could have done so. He didn't do so. He granted the summary judgment. I think that in terms of how you analyze it, I mean, the 23A factors do require analysis of the typicality and adequacy of the representatives. But I think here, just on the 23B3 question of predominance, I think you can look at the reliance issue and the fact that the court below said there were no individual reliance requirements for the fraud claims because West Virginia law doesn't require reliance for fraudulent concealment. But that's simply not correct. The Highmark decision, which we cite to you, makes very clear that reliance is required for the fraud claims. Even the Pocahontas Mining concurring decision that the district court cited to, which was really just drawing a distinction between pleading standards for fraudulent concealment and the proof required, even that concurring opinion recognizes that reliance is required for fraudulent concealment claims. And so I think that's enough, Your Honor, if you do reach the fraud certification to vacate that and send it back. My problem is that it's still part of the certification order, and the certification order is before us. Correct, Your Honor. And I think all you have to look at is the B3 question of predominance. And I think once it's clear what the law is in West Virginia on reliance, that that has to be vacated and reversed. If there are no further questions on fraud, I'm happy to address it, but I'll turn to the contract claim certification. So the district court's certification of the contract claims turns on its conclusion that each of the 3,700 leases imposes, and I quote, the same royalty obligation, regardless of there being at least 70 different forms of leases with wide variation in the lease language. So what do you do with the default marketability rule? Yes, Your Honor. So I have four answers to that. I think there's four reasons why the default marketability rule doesn't essentially give all of these leases the same royalty obligation. The first is that implied duty can be waived. The Kellum case from the West Virginia Supreme Court of Appeals acknowledged that. And as we noted in several places, including footnote 13 of our reply brief, there are a number of contracts in this mix that have expressed waivers of the implied duty. So it's a separate question from actually contracting around the implied duty, but actually straight up waiving its applicability. The Glover name plaintiffs are among those leases, and this is the language from that lease. Quote, lesser hereby waives any implied covenant to drill, prevent drainage, further develop, or market production. And as this court said in the Adair case, the fact that there are leases where there is an express negation of the implied duty means that you've got, you have individualized inquiries where you're going to have to look at the lease language. So that's point number one, is there are leases here that actually affirmatively waive the implied duty. The second point, your honor, is we don't actually think the district court got the implied duty right. There is no opinion of the, so what he said is that the implied duty requires that proceeds be paid, royalties be based on the gross proceeds received at the first point of sale from an unaffiliated third party. There is no case of the West Virginia Supreme Court of Appeals that describes the implied duty in that way. As the Kellam Court said, the Taney and Wellman line of cases are about the deductibility of post-production costs. That's a different question from who you sell it to, what price you get. The Taney holdings were only if the lease did not address the issue. And that is my third point, your honor. That is my third point. So I think the first is you can discard the implied warranty entirely. I think there are cases that say that. The second is I don't actually think this is a principle of West Virginia law. The implied duty is, but this take on it is not. Because in the district court below cited three federal district court opinions, all of which said that they were predicting how West Virginia law would come out. And if you look at the Kellam case, which actually follows post time, right, from those district court opinions, the concurring opinion is the only place in the Kellam decision where you find this particular take on the implied duty. And there is no citation of law in Justice Hutchison's opinion. And the majority had the opportunity to side with him, and they didn't. So I think if you're going to ask yourself, is this even West Virginia law on the implied duty, I think the answer is no. That brings me then to my third point, Judge Niemeyer, which is even if this is a correct interpretation of the implied duty, you can contract around it. You can expressly, you can waive it, but you can also say things that make clear that we are going to allow affiliate sales. We are going to, instead of basing the royalty on proceeds, base it on value. So proceeds being what you get from the actual sale, value being market value, which can be determined in a lot of different ways. You can look at some sort of index price, right? I don't know all the index prices, but let's just make one up, right? The Dow Jones index price of natural gas. You can base the pricing on comparative sales in the area. And you can write those things into your lease and get around the implied duty of marketability. And there are a wide variety of different kinds of language in these leases. And you've got to look at those, and that's what Kellum says, to figure out whether the implied duty has been negated. And then my fourth answer, Judge Berner, is even if you accept this principle of law that the district court set forth, his understanding of the implied duty, it still doesn't get the district court to a single common question, to a single common royalty obligation, because what he says, excuse me, is he says that the implied duty requires the royalty to be based on the proceeds from a third party sale. How he describes the act of common royalty obligation is that there is an obligation to pay separately on natural gas liquids based on proceeds from the first affiliate sale. There's three parts to that, right? Pay separately on natural gas liquids, base the royalty on proceeds, and it has to be a third party affiliate sale. He doesn't, the first part is not covered by his understanding of the implied duty. Nowhere in even his understanding of the implied duty is there a requirement that there be a separate royalty payment on natural gas liquids. And so how are you going to figure that out? You have to look at the individual contracts. The contracts may say that the royalty payment should be on gas generally, right, with no further description. So you pay it on gas, and the natural gas liquids are sort of accounted for as part of that. That question is not answered by his implied duty. So even if you get through my first three answers to the implied duty of warranty, it still doesn't get the court to the place where you can just ignore the lease language. And if you have to look at the individual lease language in at least 70 different forms, you're right where Adair was, right, which is that variable lease language means that individual issues will predominate over common ones, and therefore class certification is inappropriate. One thing I did want to address is the district court and the plaintiffs make a big deal about this March 2021 letter. And they suggest that we have been treating everyone the same way with respect to natural gas liquids, that we've paid everybody the same way, and that there's only two ways, irrespective of lease language, to pay natural gas liquid royalties. I think that is a misunderstanding of that March letter. If you look at the March letter, all it's saying is it addresses just one aspect of how you pay royalties, and that's whether you pay on natural gas liquids separately or as part of the wet gas. So I was thinking about this this morning. I think it's appropriate because it's Halloween. An analogy. Think about the natural gas liquids like pumpkin seeds, right? Do you pay for the royalty on those pumpkin seeds separately? So after you've carved the pumpkin or you get the seeds out and you say here's the royalty on the pumpkin seeds, here's the royalty on what's left. Or do you pay the royalty on the pumpkin seeds as part of the pumpkin? And how you account for that there, the fact that you have these pumpkin seeds, is that the pumpkin is going to weigh more, right, if it's got the pumpkins in it. And that's all we were saying in the March 2021 letter is that there's two ways to account for natural gas liquids. While they're still in the natural gas, in which case the BTU value, which just means the heat content, is going to be greater. That's like the pumpkin is going to weigh more if the pumpkin seeds are still in there. The other way is if you actually separate the stuff and then you calculate a royalty on each one. None of that means that we were acting paying royalties with complete disregard of the lease language. But why do you send the same letter to everyone? We did. We did. And that means we were, I'm sorry. If the leases are different, then why do we send the, because their allegations is regarding the calculation. Why do you send the same letter to everyone? Correct. You're on the calculation. The letter just addresses that question of whether the royalty should be separate for natural gas liquids or part of the natural gas. And we did send the same letter. And we did, for that particular question, we did treat everyone the same way. Like we didn't pay a separate natural gas liquid royalty. But the leases are still relevant for each and every person because it doesn't, Your Honor, to your question, it doesn't tell you how to calculate the royalty. So if we go back to the pumpkin analogy, if you know the weight of the pumpkin, that doesn't tell you how to calculate the royalty. How you calculate the royalty, then, is you've got to figure out what price do you use. Do you use the price that you actually got for selling the pumpkin? Do you use the market value of the pumpkin? If you use the price you actually got, is it the price from the sale to the first person or only the price from the sale to the supermarket? If I'm understanding their argument correctly, it's not the actual calculation. It's the method of calculation that is the same. It's common. And it is not. The method of calculation is not, and I think if you look at that letter, you'll see that all it addresses is whether you're calculating a separate royalty for pumpkin seeds, natural gas liquids, or if you're calculating one royalty with the natural gas liquid still a part of the gas. The method, the math, the pricing, all of that is dictated by the leases. We say that, and that's in the record. But, again, I think if you look at the letter, you'll see that that's all it's talking about. It's saying do we give you one royalty for the gas or do we treat it as two royalties when the seeds are separated from the pumpkin? The record shows a chart of 70 different categories of leases based on, I guess, somebody's analysis of the different components of the lease or the different requirements in the leases. The district court certified three subclasses, right? Yes. And I'm trying to figure out how the court handled 70 different types of leases and compressed them into three subclasses. I see my time has expired. Thank you, Your Honor. So, if I give you two answers, I mean, I think the first is I don't think you have to reach the subclasses, because I think the idea of certifying it at all means you have to blow past the individual lease language. When he separated it into three subclasses, he separated it into one, which is sort of qualitatively different. It's like lease terms that include the word decatherm, basically. And then the other two were based on the deduction of post-production costs, the TANI issue that we were talking about. And he says one category includes leases that don't address post-production costs at all, and one category addresses post-production costs but doesn't comply with the TANI requirements. We think that the subclasses actually make things even more confusing, because just take that second subclass, the question of what are all the leases that talk about post-production costs but don't comply with the TANI requirements? Kellam makes very clear that the question of complying with the TANI requirements is a case-by-case analysis. You have to look at the individual lease language, and you can't just determine carte blanche that however many of these lease categories, 30 of them, they talk about post-production costs but don't meet the three TANI factors. Kellam makes very clear that that's a case-by-case question. So I think the shorter answer, Your Honor, to your question is I don't think the subclasses help. I think they actually, again, blow past the lease language and raise a problem with the certification. Thank you, Your Honor. Mr. Masters? With respect to the leases, the payment on the leases, a lot of these leases were applied that were reviewed initially by both parties, and that information was provided to the court. The court then, after it was provided, he looked through it, and in a clarifying order is what you're talking about, where he went back, looked at the leases, and divided them up into three separate subclasses. There are 3,000 or 3,000 leases. The way that this has been done many times as far as using a class-action methodology to resolve these claims is to do just that. And the court then looks at them, the categorizations. If somebody wants the court to take a look at a different lease or some lease in a different way, then the plaintiffs or the defendants have an opportunity to say that, and then the court makes those decisions. Needless to say that lessors and lessees don't agree a lot of times on what the lease means. I mean, obviously, it's a big difference. The difficulty, I did some study of this in the record, and I saw that chart with the 70 different categories, and those leases actually use different words for the same things, which could mean different meanings or could mean the same meaning. And they have different provisions for the criteria for at what stage or in what circumstance the royalty is paid. And the parties seem to agree that there were 70 different leases. Now, it seemed to me in a typical contract case, we would have to look at each one of those leases to determine. You can't go in gross and say reduce 70 different leases down to saying they breached or they didn't pay. That's basically what the court said. They all failed to pay adequate, the common question is they all failed to pay adequate royalties or timely royalties or both. And that doesn't get to the fact that that begs the question. The question is whether they did do that. And to determine that, you would have to look at each lease, and then you'd have to attribute that lease to a class member, which I understand was a big fight over discovery. It was a huge fight over discovery. According to the record, EQT represented that their records would not permit them to make that determination, that it would require going to the land records and making some assessments. But I've never, I practiced law for a long time. I never saw a case where you told the party he had to go out and do the research to satisfy a discovery request. You produce documents that you have, information you have. And so the bottom line is how do we satisfy ascertainability and commonality and typicality components of the class action rule when we're dealing with highly individualized leases, which we recognize in Adair. Adair seems to be in the same area as this and recognize that. I said a lot, so I'll let Blake respond. Well, first, what the judge did was look at them, and he did separate them out into three, going back to the lease issue. He did separate them out, but here's the most important thing, I think, in all of the things you all read. And that is our only complaint was they didn't pay the NGLs when they were supposed to. That, going back to 2012, EQT set up this deal where they had a subsidiary who was a production company, an energy company, and they then ran it. And if you look at the SEC reports, I mean, they definitely ran it, and it all ran out of there, and it still is. So it's one company, all right? Now, so the alter ego, we think, I mean, I don't see how factually they weren't alter egos. I mean, it was an EQT company, and they basically admitted if you get them in a corner, they almost have to. But from they decided, this is what happened. They decided they weren't going to pay the NGLs on NGL prices back then. And they haven't up until this letter. They sent this letter after we filed this lawsuit. It wasn't a good, I mean, I'm not complaining about them. I mean, that's not the point, but anyway, they changed their method, and they pay now exactly what we're asking them to repay to these lessors that didn't have this money. And they didn't tell them. The reason that this fraud, I mean, that's all up to the courts, but the reason this fraud issue was brought up is because they, EQT, did not include on their remittance statements that they were even processing and selling the NGLs. They took the position, this is not a standard thing. This is not something every other producer or seller of oil and gas did. They paid. In fact, for example, Mr. Goshorn was receiving NGLs from the TransEnergy. It was a company that he was litigating against at that time. He was receiving NGLs then, back in 2012, back in 2011. Can you address the fraud question separately in the issue of reliance that we discussed with your colleague? Yes. As I see it, reliance is a required requirement of fraud under state law, and it's an individual question. In fact, summary judgment was granted against the named plaintiffs on that very issue. So how can a class be certified when there's an individual determination for each landowner as to whether they relied reasonably on the representations? Okay. Well, I mean, I think part of the facts relating to that is that EQT did not disclose. They were even producing and selling it. And so the reliance issue is they didn't disclose it, and they had a legal duty. Well, the not disclosing it is the fraud. That's not the reliance. Well, I was coming to that point. I'm sorry. Anyway, the EQT had, in other words, had a duty to put on the remittance statement what they're doing. If they're taking oil, gas, NGLs, they're required to put it on there. So with respect to that duty, the reliance, how can they rely? I mean, they have nothing to do but rely on what EQT tells them and does. I mean, it's not like they can see. Well, it's not like a potato farm where if you sell potatoes and have somebody or sell them potatoes and you have somebody take them to the market for a percentage of the price, they can't see. I mean, it's a hole in the ground with a pipe in it, and it's trafficked to somebody to sell. It's all in their knowledge. The lessors don't know anything about what happens. So the only thing they have to rely on is that remittance statement. And for years they took a position and took a position with even these class representatives or were class representatives anyway, they took a position with them that they were actually paying them correctly. They were paying them, they said, on the price of gas, not the price of NGLs, and never told them a thing about it. So that shows the importance of their reliance. And the reliance then in that situation is not the fault of the failure for them to tell them is not the lessors' fault. The lessee is the one that didn't. We're all against you on that. Did you cross-appeal? They stayed the case before we, the time ran out. Pardon me? They stayed the case on that issue before we had a chance to appeal. We're on appeal on the certification, right? On the certification. And the certification includes fraud, which has an element of reliance. Right. The district court said reliance wasn't necessary, but it recognized it would be individualized reliance. Did you cross-appeal on that issue? We did not cross-appeal on that. But, there again, we feel like that is something that goes along with the basis of the dismissal. Well, I'm curious because, Judge Neal, I asked a question earlier regarding your named plaintiffs have been dismissed on assembly judgments. How are we to handle this issue when we don't have named plaintiffs on this reliance? Well, the reason that we felt we had a duty to go forward representing a class, which is still a class, we felt we had a duty to proceed with the litigation. I mean, what the court does with that is different, but I didn't see. I mean, I understand the point of the question, but we have a duty for the class to go forward with the case, I think. I mean, it's an unusual question, but I think our research indicated we did have that. We still have a class. Can you address the breach of contract issues? Yes, please. I'm sorry. The breach of contract issues, I mean, first of all, with respect to Kellum's decision, the Kellum decision has the one point, I guess, that deals with the duty to, if there is a question, then to, with a lease, to look into the lease. In the situation, I mean, what we were doing, we looked at the leases, and they all were gone through, and they were provided to the court. The court made that decision as to whether it was needed to go outside that. There were a lot of leases were not included out of all the leases we looked at into the ones that we felt were all, but the court had to make that decision. The defendant did the same thing. So the court looked into that and made a decision on that issue. So if, I mean, I think what was talked about in Kellum was performed by the court. Well, you know, on a breach of contract claim, traditionally we start with the language of the contract to determine the duty owed and the rights that the parties have. And both parties, I guess, brought forth leases, and the record seems to support an agreement that there were at least 70 different contractual formations or formulations in this case, and they categorized them. I couldn't quite figure out how they were categorizing them, but I did recognize that even for similar types of provisions, the leases were using different language, and whether one, they used the word gas, whether that meant wellhead gas or gas with NGLs or gas without NGLs. And the problem I was wondering is how do you take all these various contracts and tell the parties they're bound by a common determination when we haven't identified the right royalties for each person? It depends on different factual demonstration, different circumstances. The geography of payment on these leases is fairly complex. You can pay for it at the wellhead. You can pay for it based on the first sale. You can pay it after NGLs have been removed on the first sale. You can pay for it after it gets into the market. You can pay for it based on what was received, or you can pay for it on the market value of gas. And all these leases have different provisions with respect to this and different combinations. Some you can deduct the expenses for removing NGLs. Some you can't. Some are silent on it, which would, of course, bring up the tawny proposition. But the question is how do we ‑‑ this seems to be a lie in the face of multiple requirements under 23 that the class members be typical of all the class, that they're actually going to be representing each separate person who has a different contract. If I can speak to that. Yes, of course. The only issue, and I mentioned this before, the only claim here is that they didn't pay the ‑‑ they did not pay the royalty owners for about 10 years the way they decided to pay when they sent that letter in March of 2021. Wouldn't that depend on what they're paying for? Whether they ‑‑ if they ‑‑ if you came to my house and did some electrical work and did some plumbing work and did some carpentry work and then you sent me a bill for services rendered, $1,000, that's common to another one you have. But if we're sitting there challenging whether the plumbing work was good or the electrical work was fine or you handled it or you billed it wrong, you'd have to look at the underlying obligations, wouldn't you? I mean, the fact that you say they didn't pay the royalties, that depends on what the contract says, doesn't it? To pay the royalties, that's correct. Our issue in this case was do you pay ‑‑ they did not pay anyone their royalty on the NGLs. It's a matter of the lease. They're expert. But some people had provisions that would sell the gas at the wellhead where the NGLs were included in the gas. And there could be then a sale of the raw gas with the NGLs in it to a first third party or there could be a processing of the gas in which the NGLs were taken out and then sold separately from the residual gas. And that all depends on what each lease says. And then the question is whether you pay on the basis of proceeds or market value. And those vary, too. I just don't quite know how we bunch those, and I'm looking to ‑‑ Well, I mean, all leases are not different in terms of the way you pay, I mean, the payment of them. Here we have one issue. And did this lease permit them to pay for the NGLs what they got for the gas, basically? It's basically what they were doing. And what it started to say about their expert. Their expert stated, and it was asked several times, was there anything in any of these leases that required EQT or permitted them to pay on the dollars for the gas as opposed to dollars for the NGLs? She said no, there isn't. She looked at all of them as well as our expert did, our experts. I see your red light's on. Pardon? Your red light's on. Thank you, sir. Mr. Lin. Thank you, Your Honors. Just a few quick points. Two things on the fraud issue. I didn't hear an answer from my friend about what do you do about state law requiring reliance. I think his complaint is that it's difficult to show reliance. But, again, I think you'll see in the summary judgment orders, there's an explanation for how you could have a reliance issue in a fraudulent concealment case, particularly if you look at the Glover analysis. The Glovers called as soon as they received the first remittance, and then they had a whole conversation with the company about what was in there and what wasn't in there. And that, I think, to the district court was convincing that there was no reliance. On this question of what do we do with the fact that the named plaintiffs are gone, I'd refer the court to the SOSNA case, S-O-S-N-A. It's a Supreme Court case from decades ago that talks about how the class does continue, even if the original named plaintiffs are mooted out, particularly where there's been a grant. It's a little bit different where there's been a denial of a class certification, but where you've got a grant, again, it's an independent legal entity. It was sometimes referred to as the headless class action. I think you can rule on the certification here. If you find that you can't, I would urge this court to consider, perhaps, the applicability of the Munsingware Doctrine where we can't, if you conclude that we're unable to challenge the certification of the fraud claim because of something that has precluded our ability to appeal it. Maybe you just vacate the certification of the fraud in that way. And then just very quickly on the- Can I just ask you to address the applicability of TANI? Because as I read your expert report, or the expert basically admitted that the categories that are specified in TANI and Killam aren't all present in any of the leases. Is that right? In other words, in TANI there needs to be the three sections, right, for each lease. Were there any leases that had all three? The language- Yes, I understand, Your Honor. I think there's a couple answers to that. The first is that TANI is just about the deductibility of post-production costs, and those standards are just about the deductibility of post-production costs. This case, of course, is about something much bigger than that, right, which is the entire royalty obligation, which includes did we have to pay separately on NGLs? How do we price the royalty? Is it market value? Is it proceeds, leases? Can we deduct? That is one limited question. And so I think just as a threshold matter, I don't think that that resolves the fact that you still have to look at the leases for everything else, even if you think you can resolve the TANI issue in one swoop. Second, I'm having trouble, I'm sorry, recalling the expert testimony there, but in our competing chart at 6908 and thereon in the joint appendix, we have designations where we say this lease language does expressly talk about post-production costs, this doesn't, et cetera. The expert testimony that my friend was referring to was, and, again, I would urge you to look at the exchange in the record on that deposition, is about whether there was expressed language that permits the NGLs to be treated as part of the gas, right, the sort of seeds in the pumpkin issue. And what the expert said is not the way you asked the question, right, and what she's saying is there is no specific word that says, you know, do we pay the NGLs as part of the gas? But she was not admitting that there is another language that might address that, as Judge Niemeyer pointed out. If the language of the lease says you pay your royalties on the gas at the wellhead, that seems to me to say you're paying on the pumpkin, including everything that's in it, you know, at the pumpkin patch. So I don't think that the expert's testimony gives the district court any footing to, you can't sweep away all of the lease language. Just one question. Sure. I'm curious, so, because he brought it up, regarding the reasoning for changing the method of calculation in March of 2021. Oh, like, as in why it happened? Yeah, so why are we changing to the method, the calculation method that you are using now? Of course, Your Honor, and not to quarrel too much with the premise, but I mean, again, I don't think it was a method change. It was a, what is the product, right? Are we valuing the gas with the NGLs, or are we valuing the NGLs and the residual gas separately? That is the only change that happened. I think if you look at the letter, I'll let the letter speak for itself, J4675. I think, as I understand, the suggestion is that, and also there's testimony that says that for a long time, selling NGLs separately was not super profitable, and it wasn't getting a lot of stuff back. And, in fact, just paying a royalty on the gas, the raw gas with the NGLs in it, was oftentimes the better and more lucrative recovery for the lessors and the lessees. And so I think some of the change is that. It's just that NGLs have become much more profitable. There's also, as we point out, there's like a more efficiency in a different accounting system. It's sort of easier to kind of track and keep track of the two things separately. But there's all kinds of business reasons, I think, that went into why we went from treating the pumpkin seeds as part of the pumpkin versus the seeds and sort of the shell separately. But, again, that's the only change that we made. Everything else about calculating the royalty still requires consultation of the lease. And even that, Your Honor, I mean, it could be. Just because we were doing it that way doesn't mean that we were right about it. And I'm comfortable saying that. You still have to look at the leases to determine what was required. And ultimately, for the question that's before this Court, can you certify 3,700 leases into a single class? The answer is you can't. It doesn't mean that we were correct every time with every lease. But you can't treat it all in one sort of en masse. Thank you, Your Honor. We'll come down and greet counsel and proceed on to the next case.
judges: Paul V. Niemeyer, DeAndrea Gist Benjamin, Nicole G. Berner